2012 COA 4

**Scott GESSLER, in his official capacity as Secretary of State for the State of Colorado, Plaintiff–Appellee,**

**v.**

**Nancy DOTY, in her official capacity as the Clerk and Recorder for Arapahoe County, and the Board of County Commissioners of the County of Arapahoe, State of Colorado, Defendants–Appellants.**

No. 10CA2533.

Colorado Court of Appeals, Div. I.

Jan. 5, 2012.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Kathryn L. Schroeder, County Attorney, John E. Bush, Jr., Deputy County Attorney, Ronald A. Carl, Assistant County Attorney, Littleton, Colorado, for Defendants–Appellants.

Opinion by Chief Judge DAVIDSON.

¶ 1 This case requires us to decide whether counties or the state must bear the cost of providing drop-off boxes for mail-in ballots at every polling place.

¶ 2 In 2009, the General Assembly passed House Bill 1186, amending Colorado's Elec-

tion Code (Code), § 1–8–113(1)(a), C.R.S. 2011, to permit voters personally to deliver mail-in ballots "on election day to any polling place in the county in which the elector is registered to vote." Previously, voters had been permitted to deliver their ballots on election day, but only to a limited number of early voters' polling places. An effect of this amendment was to require Arapahoe County to make available 197 additional locations for drop-off of mail-in ballots during the 2010 general election, at an alleged added cost of $80,000.

¶ 3 Defendants, Nancy Doty, in her official capacity as the Clerk and Recorder for Arapahoe County, and the Arapahoe County Board of County Commissioners (the county), notified plaintiff, the Secretary of State (the state), that because the General Assembly had not appropriated additional funding to cover the county's increased cost, it would not provide the additional drop-off boxes, pursuant to section 29–1–304.5, C.R.S.2011, commonly referred to as the unfunded mandate statute. The unfunded mandate statute applies to any "new state mandate or . . . increase in the level of service for an existing state mandate beyond the existing level of service required by law." § 29–1–304.5(1), C.R.S.2011. A "state mandate," generally, is a legal requirement established by statute or rule which requires a local government to provide a service or undertake an activity according to state standards. See § 29–1–304.5(3)(d), C.R.S.2011.

¶ 4 The state then filed this action seeking a preliminary injunction requiring the county to enable the delivery of mail-in ballots on election day to every polling place. See § 1–1–107(2)(d), C.R.S.2011 (secretary of state may enforce the election code by injunctive action). The court granted the injunction in favor of the state, determining that the Code's requirement that "the cost of conducting . . . elections . . . shall be a county charge," § 1–5–505(1), C.R.S.2011, took precedence over the unfunded mandate statute's provision that any new state mandate or increase in the accompanied by a reimbursement to cover local governments' costs "shall be optional on the part of the local government," 29–1–304.5(1).

¶ 5 The county appeals. The question we address is, notwithstanding the unfunded mandate statute, must a county bear the cost of providing drop-off boxes for mail-in ballots at every polling place on election day, as required by the amendment to section 1–8–113(1)(a)? We agree with the trial court that section 1–8–113(1)(a) of the Code is in irreconcilable conflict with section 29–1–304.5(1) of the unfunded mandate statute, and with its resolution of that conflict in favor of the state. Therefore, we answer yes, and affirm.

## I. Standard of Review

¶ 6 The only contested factor raised in the trial court relevant to the grant of a preliminary injunction concerned the relationship between the Code and the unfunded mandate statute. See Rathke v. MacFarlane, 648 P.2d 648, 653 (Colo.1982) (setting forth factors for consideration in deciding preliminary injunction motion). Thus, because the trial court's ruling concerned only legal questions, we review that ruling de novo. See CF&I Steel, L.P. v. United Steel Workers of America, 990 P.2d 1124, 1127 (Colo.App.1999), aff'd, 23 P.3d 1197 (Colo.2001).

## II. Background: Elections and the Colorado Constitution

¶ 7 A typical "state mandate" is a statutory prescription, categorized as either a program or procedural mandate. See § 29–1–304.5(3)(d)(I)–(II), C.R.S.2011; see, e.g., § 30–11–104(1)(a), C.R.S.2011 (counties shall provide necessary county buildings); § 29–22–103(2)(a)–(b), C.R.S.2011 (counties shall designate an emergency response authority to mitigate hazardous waste incidents); § 30–15–201(1), C.R.S.2011 (counties shall erect and maintain roadside notices concerning campfire safety).

¶ 8 The issue here involves state election law, however, which has its underpinning, not in legislative policy or programs, but in the constitutionally guaranteed right of suffrage. See, e.g., Bullington v. Grabow, 88 Colo. 561, 564, 298 P. 1059, 1060 (1931) (absentee voting legislation constitutionally "enacted for the purpose of procuring a fuller expression of the public will at the ballot box" (quoting

*Jenkins v. State Bd. of Elections,* 180 N.C. 169, 104 S.E. 346, 351 (1920))).

¶ 9 The Colorado Constitution expressly recognizes the right of citizens to vote and to have their votes counted. Colo. Const. art. II, § 5; *see also Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[T]he right of suffrage is a fundamental matter in a free and democratic society."); *Jarmel v. Putnam,* 179 Colo. 215, 217, 499 P.2d 603, 603 (1972). The constitution assigns to the General Assembly the duty to "pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Colo. Const. art. VII, § 11.

¶ 10 The framers deemed all territorial laws, including those stating the counties' obligations concerning elections, to be effective unless and until changed by the legislature. *E.g.,* R.S. 1868, ch. XXVIII, §§ 15–16, 44 (county shall designate polling places, appoint election judges, and provide ballot boxes at county expense); *id.* § 34 (county clerk shall total and report election returns). Since that time, the General Assembly has codified these duties and enacted, reenacted, and amended various measures directed at preserving, extending, and protecting the franchise in light of social growth and development, typically by requiring counties to expand voters' access to the ballot. *See, e.g.,* § 1–8–104, C.R.S.2011 (voting by mail); § 1–8–113(1)(a) (drop-off boxes for mail-in ballots); § 1–8–202, C.R.S.2011 (early voting); *see generally* §§ 1–1–101 to 1–13–803, C.R.S. 2011. Likewise, it has codified the traditional requirement that counties bear the expense of conducting elections. *Compare* § 1–5–505(1) (cost of conducting elections, including printing and supplies, is a county charge), *with* R.S. 1868, ch. XXVIII, § 33 (county shall compensate election judges and clerks), *and id.* § 44 ("[t]he board of county commissioners shall provide a suitable number of ballot boxes, at the expense of the county").

¶ 11 The state argued unsuccessfully in the trial court that, viewed in this context, the requirement that the county provide additional drop-off boxes, codified in section 1–8–113(1)(a), concerns the right of suffrage and, thus, stems from a constitutional, not a statu-

tory mandate, rendering inapplicable the unfunded mandate statute. However, although this argument has merit, and the state raises it again here, we do not decide it because we can affirm the judgment on the narrower basis considered by the trial court that, even if section 1–8–113(1)(a) is a state mandate, it supersedes the unfunded mandate statute. *See Fasing v. LaFond,* 944 P.2d 608, 612 (Colo.App.1997) (court need not determine all issues on appeal when case can be decided on narrower grounds).

III. The Code's requirement that counties pay the cost of conducting elections prevails over the unfunded mandate statute.

■ ¶ 12 Section 1–5–505(1) of the Code provides, in pertinent part: "Except as provided in section 1–5–505.5, the cost of conducting general, primary, and congressional vacancy elections ... shall be a county charge, the payment of which shall be provided for in the same manner as the payment of other county expenses." (Section 1–5–505.5, C.R.S.2011, provides for limited reimbursement by the state to counties for the cost of deciding state ballot issues or questions.)

¶ 13 Pursuant to section 2–4–205, C.R.S. 2011, when two statutes are in irreconcilable conflict, the more specific enactment shall prevail over the more general one, "unless the general provision is the later adoption and the manifest intent is that the general provision prevail."

¶ 14 Here, as did the trial court, we conclude that section 1–5–505(1) of the Code and section 29–1–304.5(1) of the unfunded mandate statute are in irreconcilable conflict; section 1–5–505(1) is the more specific of the two; and, although section 29–1–304.5 was the later adoption, there is no manifest intent that it should prevail.

A. Sections 1–5–505(1) and 29–1–304.5(1) are irreconcilable.

¶ 15 The county contends that the trial court erred in concluding that the conflict between sections 1–5–505(1) and 29–1–304.5(1) is irreconcilable. It suggests that section 29–1–304.5(1) may be interpreted to modify section 1–5–505(1), so that "election

services in general must continue to be paid for by counties, [but] state-mandated increases in election services are optional on the part of counties, unless additional funding is provided to cover the costs of the increase in services." We disagree.

¶ 16 Section 1–5–505(1) is unequivocal; it provides that *"the cost* of conducting general, primary, and congressional vacancy elections .... *shall be a county charge* " (emphasis supplied). This cost, necessarily, consists of the expenses counties incur when providing those election services required by companion provisions of the Code, for example: establishing election precincts and polling places, §§ 1–5–101(1), 1–5–501, C.R.S.2011; providing notice of upcoming elections by publication and post, §§ 1–5–205(1), 1–5–206, C.R.S.2011; appointing and compensating election judges, §§ 1–6–104(1), 1–6–115(1), C.R.S.2011; and preparing, distributing, receiving, counting, and storing ballots, including mail-in ballots, §§ 1–5–402 to 1–5–413, 1–7–601, 1–8–101, C.R.S.2011.

¶ 17 Thus, by its terms, the Code requires that the county shall provide and bear the costs of providing election services *to whatever extent dictated by the General Assembly,* notwithstanding that changes in required services may create additional costs. *Compare, e.g.,* § 1–11–302(2), C.R.S.2011 (where election contested, state house of representatives or senate may give notice to county clerk to conduct special legislative election), *and* § 1–5–505(2)(a), C.R.S.2011 (county in which irregularity requiring special legislative election occurred shall pay the costs of conducting it), *with* § 1–5–105.5 (providing state reimbursement to counties for the cost of state ballot issues and questions).

¶ 18 According to the county, however, section 29–1–304.5(1), would allow counties, unless reimbursed by the state, the option to refuse to provide any additional election services, such as those required by section 1–8–113(1)(a). Thus, section 29–1–304.5(1) would render optional that which is mandatory under section 1–5–505(1). *See* § 2–4–201(1)(b), C.R.S.2011 (General Assembly presumed to have intended statutes to be effective in their entirety); *City of Colorado Springs v. Bd. of County Comm'rs,* 895 P.2d 1105, 1118 (Colo.

App.1994) (declining to harmonize two statutes where effect of harmonization would be to nullify one of them). They cannot be harmonized.

B. The requirement that counties pay the cost of conducting elections is more specific than the unfunded mandate statute.

¶ 19 Of two conflicting statutes, one applying narrowly to a particular circumstance is more specific than an enactment providing for a generally applicable regulatory scheme. *See In re Marriage of Rozzi,* 190 P.3d 815, 819 (Colo.App.2008) (statute concerning judicial referral to alternative dispute resolution as to parental responsibilities controls where it conflicts with statute concerning judicial referral to alternative dispute resolution in general); *B.A. Leasing Corp. v. State Bd. of Equalization,* 745 P.2d 254, 256 (Colo.App.1987) (statutory interest rate specified for tax refunds prevails over general statutory interest rate), *aff'd sub nom. Gates Rubber Co. v. State Bd. of Equalization,* 770 P.2d 1189 (Colo.1989).

¶ 20 The county argues that the unfunded mandate statute is the more specific because it created a special exception to all existing statutes which might otherwise require local governments to provide funding for additional state-mandated services. We do not agree. To the contrary, section 1–5–505(1), pertaining only to election funding, is more specific than section 29–1–304.5(1), which broadly applies its requirement for state reimbursement to most existing state programs.

C. The General Assembly did not intend to hamstring funding for election services when it enacted the unfunded mandate statute.

¶ 21 We also disagree with the county's argument that the legislature intended the unfunded mandate statute, as the newer enactment, to effectively repeal the provisions of section 1–5–505(1).

¶ 22 "Absent clear and unmistakeable legislative intent to the contrary, a general statute will not be deemed to have repealed

an existing specific statute." *People v. Falls,* 58 P.3d 1140, 1142 (Colo.App.2002). Here, nothing in the unfunded mandate statute expresses a manifest intent to supersede the election funding scheme set forth in the Code. Nor is there any such indication in the legislative history of that provision. *See* Floor Debates on H.B. 1262 before the Full H., 58th Gen. Assemb., 1st Sess. (Feb. 20–21, 1991); Floor Debates on H.B. 1262 before the Full S., 58th Gen. Assemb., 1st Sess. (Mar. 21–22 and 25–26, 1991); *see also People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002) (courts should look to legislative history where statute is in conflict with other provisions).

¶ 23 However, the legislative history of the Code amendment at issue here is revealing. The need for the amendment developed when the City and County of Denver began to accept mail-in ballots on election day at every polling place. Numerous voters not registered in Denver thought that their districts also would do so, having learned of this development through the Denver metro area news or directly from their elected representatives. The result was wide-spread confusion among absentee voters concerning which polling places would accept ballots not returned by mail. Hearings on H.B. 1186 before the S. Comm. on State, Veterans & Military Affairs, 67th Gen. Assemb., 1st Sess. (Mar. 11, 2009); Floor Debate on H.B. 1186 before the Full S., 68th Gen. Assemb., 1st Sess. (Mar. 16, 2009).

¶ 24 Although, during the debate, some county clerks and legislators voiced concern based on the cost entailed in making additional drop-off boxes available, the bill's proponents maintained that the General Assembly's constitutional duty to ensure that people who have a right to vote are able to exercise that right overrode matters of cost or convenience to counties. Floor Debate on H.B. 1186 before the Full S., 68th Gen. Assemb., 1st Sess. (Mar. 16, 2009).

¶ 25 That the intent of the legislature was to prioritize citizens' access to free and fair elections over convenience or cost savings to counties also was apparent in amendments to section 1–5–505(1). *See Larimer Co. Comm'rs v. Sec'y of State,* 911 P.2d 698, 702 (Colo.App.1995) (looking to subsequent amendments to determine legislature's intent for earlier statute). Specifically, in 1999, the General Assembly amended section 1–5–505 to add a provision requiring any county in which voting irregularities occur to pay the cost of conducting a district-wide reelection. *See* § 1–5–505(2)(a). It did so again in 2000 to account for an exception created by the concurrent enactment of section 1–5–505.5, allowing for state reimbursement to counties for statewide ballot measure elections. That same enactment limited the amount of reimbursement and specified that "[w]here the state's reimbursement to a particular county ... pursuant to section 1–5–505.5 is less than the costs of conducting [the] election ... such differential shall be assumed by the county." § 1–7–116(2)(b), C.R.S.2011.

¶ 26 Accordingly, we conclude that the trial court correctly determined that counties must provide drop-off boxes for mail-in ballots at every polling place on election day. We reach this conclusion on the ground that the Code's funding provision, section 1–5–505(1), prevails over the unfunded mandate statute, section 29–1–304.5(1), rendering the latter inapplicable to section 1–8–113(1)(a). Based on this disposition, we do not address the other issues raised by the parties.

¶ 27 The judgment is affirmed.

Judge PLANK * and Judge NEY * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2011.